# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* PERRY FAMILY LIVING TRUST.

RONALD A. PERRY and JOSEPH R. PERRY,

Petitioner-Appellants,

v

VIRGINIA B. PERRY, Personal Representative of the ESTATE OF JAMES C. PERRY,

Respondent-Appellee,

and

JAMES M. PERRY, STEVEN J. PERRY, and ROBERT E. PERRY,

Intervenors.

UNPUBLISHED
December 13, 2016

No. 328548
Macomb Probate Court
LC No. 2014-213655-TV

Before: SAAD, P.J., and METER and MURRAY, JJ.

PER CURIAM.

Petitioners, Ronald A. Perry and Joseph R. Perry, appeal as of right the probate court's order denying their petition for construction of the James & Virginia Perry Living Trust. For the reasons stated herein, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

Jerry C. Perry (JC) died on May 14, 2014. He was survived by his wife Virginia B. Perry, with whom he shared five sons; James M. Perry, Steven J. Perry, Robert E. Perry, Joseph R. Perry, and Ronald A. Perry. In 2003, JC and Virginia established the James & Virginia Perry Living Trust ("the Trust").

In 2006, JC and Virginia restated the Trust in full, specifying that they were the co-trustees and sole beneficiaries of the Trust during their lifetimes. The restated Trust also specified that upon the death of the first spouse, the Trust became irrevocable and created a Marital Trust that included all property not previously distributed under the Trust. Because the

-1-

Martial Trust was intended to be used for the benefit of the surviving spouse, the surviving spouse was given a general testamentary power of appointment over property in the Marital Trust.

The Trust also listed specific and general distributions to occur upon the death of the second spouse. Upon the death of the second spouse, the Schedule of Article Six provided the "Perry Family Property Trust" would be created and funded with the couple's hunting property "provided such property is then owned by [the] Trust." According to the Schedule, the hunting property was to be held in trust for the benefit of two of JC and Virginia's grandsons, used by James and Steven, and eventually distributed to a third grandson. Article Nine stated that "[a]ll trust property not previously distributed under the terms of [the] trust shall be divided" between James, Steven, Robert, and Ronald. Joseph was intentionally omitted as a beneficiary of the Trust.

JC and Virginia amended the Trust on three occasions. First, in 2007, they amended the Schedule of Article Six. The amendment specified that upon the death of the second spouse, rather than being held in trust, the hunting property would be distributed to James and Steven in equal shares. Second, in 2012, JC and Virginia amended the Schedule of Article Six again, providing that the hunting property should be held in trust for the benefit of two of their grandsons, used by James and Steven, and eventually distributed to two of their grandsons. The second amendment also added Section 2 to the Schedule of Article Six, specifying that upon the death of the second spouse Robert would receive JC and Virginia's home in Warren (the "Marital Home"). Further, Article Nine was amended to include Joseph as a beneficiary of the Trust.

On May 1, 2014, the Trust was amended for the third and final time. The third amendment again altered Article Six. The language in Article Six directing the specific distributions listed in the Schedule to occur upon the death of the second spouse was removed, and Section 1 of the Schedule was also amended. While it still directed the hunting property be held in trust upon the death of the second spouse, "provided such property is then owned by [the] Trust," it changed the beneficiaries so that James and Steven were given primary use and enjoyment of the hunting property, but on the death of two of the four named sons, the hunting property would be deeded to the remaining two sons. The third amendment also provided that upon the death of the second spouse the Marital Home would be sold with the proceeds of the sale being distributed equally to the five sons. Further, the third amendment added Section 3 to the Schedule, stating that "[t]here are municipal bonds in the trust," specifying "[s]aid bonds are not to be sold before maturity," and "[d]istribution shall be after they mature" to each of the five sons "equally, per stirpes."

Two weeks after the third amendment, JC died following a prolonged illness. Petitioners allege that they have a strained relationship with Virginia and that after JC's death she indicated she intended to "cut them out of everything and give everything to their brothers." Accordingly, petitioners filed a Petition for Construction of Trust. In the petition, petitioners asserted that Virginia believed that all of the property in the Trust, including the property delineated in Article Six—the hunting property, the Marital Home, and the municipal bonds—was now part of the Marital Trust, meaning Virginia had the "unrestricted ability" to expend or transfer the property. However, petitioners argued that the property in the Schedule of Article Six did not become part

of the Marital Trust upon JC's death because JC intended the property to be distributed to his sons as provided in the Schedule, and it was therefore, "previously distributed" under the Trust. Accordingly, petitioners asked the probate court to "determine the proper administration and distribution" of the property listed in Article Six.

Virginia filed an answer to the petition, arguing that the Trust unambiguously states that all of the property in the Trust—including the property listed in Article Six—became part of the Marital Trust to provide for her benefit until her death and that only after her death would any remainder be distributed to her sons according to the terms of the Trust. Accordingly, Virginia asked the probate court to deny petitioner's request for an order of construction.

At several hearings, petitioners argued for a construction of the Trust establishing that the three pieces of property in the Schedule of Article Six were not included in the Marital Trust, meaning Virginia could not exercise her general power of appointment over the property thereby depriving petitioners of their eventual share. Petitioners asserted that a contrary reading of the Trust would subvert JC's intention in making the specific devises in Article Six. At the hearings, Virginia argued that the Trust unambiguously provided that the distributions in Article Six were only to occur after the death of the second spouse, meaning the property listed in the Schedule of Article Six became part of the Martial Trust upon JC's death because Virginia was still living. Further, Virginia argued that the Trust specified that all of the property in the Trust was intended to support the surviving spouse and that the Trust established that "the surviving spouse has the ability to do whatever they choose" with the property in the Trust.

At the first hearing, the probate court expressed "skepticism for the argument [petitioners] presented," but allowed limited discovery. At the final hearing, the probate court stated that it permitted discovery "to see if the attorney who drafted the most recent amendment and other documents could shed some light to see if there was a patent or latent ambiguity in this trust language that would allow [] some greater insight into the interpretation of what the language meant," but concluded that the evidence did not reveal any ambiguity. Instead, the court stated that

> Rather, I believe that the respondent's position is the correct position. That, indeed, this is a joint revocable living trust that did become irrevocable upon the death of the first spouse, but that the ability and the power to invade the principle and to alienate property under a general exercise of a general power of attorney is, in plain language, contained in the trust documents.

Further, the court found that the plain language of Article Six did not contain a distribution that would keep the property listed in the Schedule from entering the Marital Trust;

> The listing of assets which were managed in a trust upon the second of us to die is not a distribution, as that term is normally understood in the English language. And without some very clear parol evidence that it was intended as a distribution, the terms of the trust, as written, must apply. And, so, the petition for construction is granted in the sense that the court has constructed and construed the document that finds that the position advanced by the respondent is the one that is clearly consistent with the plain language of the trust.

Therefore, the court denied the petition.

## II. ANALYSIS

Petitioners argue that the probate court erred in its interpretation of the Trust. We review the proper interpretation of a trust de novo. *In re Miller Osborne Perry Trust*, 299 Mich App 525, 529; 831 NW2d 251 (2013), citing *In re Reisman Estate*, 266 Mich App 522, 526; 702 NW2d 658 (2005). When interpreting a trust to resolve a dispute concerning its meaning, the probate court's goal is to ascertain and give effect to the intent of the settlor. *In re Kostin Estate*, 278 Mich App 47, 53; 748 NW2d 583 (2008). "The powers and duties of the trustees, and the settlor's intent regarding the purpose of the trust's creation and its operation, are determined by examining the trust instrument." *Id.*, citing *In re Butterfield Estate*, 418 Mich 241, 259; 341 NW2d 453 (1983).

The settlor's intent must be determined by the trust's plain language and "a court must enforce the plain and unambiguous terms of a trust as they are written." *Bill & Dena Brown Trust v Garcia*, 312 Mich App 684, 694; 880 NW2d 269 (2015). However, if an ambiguity in the trust exists, the probate court "must look outside the document to determine the settlor's intent, and it may consider the circumstances surrounding the creation of the trust and the general rules of construction." *Id.* at 693. Trust language is ambiguous if "an uncertainty concerning the meaning appears on the face of the instrument and arises from the use of defective, obscure, or insensible language," or if "the language and its meaning is clear, but some extrinsic fact creates the possibility of more than one meaning." *In re Woodworth Trust*, 196 Mich App 326, 328; 492 NW2d 818 (1992). The fact that parties disagree concerning the meaning of a trust does not mean that it is ambiguous. *Bill & Dena Brown Trust*, 312 Mich App at 693.

We agree with the probate court that the Trust is not ambiguous. Article Six deals with specific distributions of property. Section "a" of Article Six indicates that upon the death of *each* spouse the tangible personal property belonging to the deceased should be distributed according to any "written statement or list" left by the deceased. However, both Section 1 and Section 2 of the Schedule state that the distributions should occur only "[u]pon the death of the *second*" spouse.[1] Further, Section 3 indicates that the municipal bonds should not be distributed until they mature, which is not anticipated to occur until approximately 2023. Accordingly, it is clear from the plain language of the Trust that section "a" of Article Six lists specific distributions to occur following the death of *each* spouse, but that the Schedule of Article Six was intended to direct specific distributions of property only after the death of the *second* spouse.

---

[1] Although the Schedule of Article Six contains the header "Specific Distributions of Trust Property Upon the Death of the Second One of Us to Die," the Trust states that "[t]he headings of Articles, Sections, and Paragraphs used within this agreement are included solely for the convenience and reference of the reader" and thus, "[t]hey shall have no significance in the interpretation or construction of this agreement." However, even absent this heading it is clear that the Schedule of Article Six contains specific devises intended for distribution only after the death of the second spouse.

-4-

Accordingly, because Virginia is still living, the specific distributions listed in the Schedule have not occurred and the property was not "previously distributed" under the Trust.

Article Seven specifies, "upon the death of one of us . . . the trust property not previously distributed under this agreement shall be held and administered in a Marital Trust for the benefit of the surviving Trustmaker." Thus, while JC's tangible personal property may have been "previously distributed" following his death under Section "a" of Article Six, and therefore did not become part of the Marital Trust, the remaining property listed in Article Six was not previously distributed, and therefore, poured into the Marital Trust.

Pursuant to Article Seven, Virginia has "the unlimited and unrestricted general power to appoint,[2] by a valid last will and testament or by a valid living trust agreement, the entire principal and any accrued and undistributed net income of the Marital Trust as it exists at the Trustmaker's death." Further, Article Seven specifies that

> [t]his general power of appointment specifically grants to the surviving Trustmaker the right to appoint property to the surviving Trustmaker's own estate. It also specifically grants to the surviving Trustmaker the right to appoint the property among persons, corporations, or other entities in equal or unequal proportions, and on such terms and conditions, whether outright or in trust, as the surviving Trustmaker may elect.

Thus, the Trust language is not ambiguous; because the property listed in the Schedule of Article Six poured into the Marital Trust upon JC's death, Virginia has the power to expend or exercise her power of appointment over the property. See e.g., *In re Estate of Reisman*, 266 Mich App at 528-529 (no ambiguity existed where the plain language of the trust created a marital trust upon the death of the first spouse, which in turn granted the surviving spouse a power of appointment over the property in the marital trust).

Further, contrary to petitioners' argument, the fact that the Trust became irrevocable[3] upon JC's death does not prohibit Virginia from expending or transferring the property listed in the Schedule of Article Six. See *Bill & Dena Brown Trust*, 312 Mich App at 694-697 (holding the surviving settlor-trustee of an irrevocable trust was permitted to transfer property that was

---

[2] "A power of appointment is 'a power created or reserved by a person having property subject to his disposition which enables the donee of the power to designate, within any limits that may be prescribed, the transferees of the property or the shares or the interests in which it shall be received; but it does not include a power of sale, a power of attorney or a power of amendment or revocation.' " *In re Estate of Reisman*, 266 Mich App at 527-528, quoting MCL 556.112(c). "A general power is 'a power exercisable in favor of the donee, his estate, his creditors or the creditors of his estate, whether or not it is exercisable in favor of others.' " *Id*. at 528, quoting MCL 556.112(h).

[3] An irrevocable trust is "a trust over which no person holds a power of revocation." MCL 556.112.

intended to be distributed to named beneficiaries after the death of both settlors where the terms of the trust provided the settlor-trustee with such power and "[t]he trustee's exercise of these powers that has the effect of diminishing trust assets available for distribution after the death of the last surviving settlor is nowhere prohibited by the terms of the trust."). The broad powers given to the surviving spouse in Article Seven demonstrate that the Trust was drafted primarily for JC and Virginia's benefit during their lifetimes and that they intended to preserve their control over their property while they were alive. While JC and Virginia listed specific distributions in Article Six, they indicated that those distributions were not intended to remove the property from their control during their lifetime by specifying that they should only occur upon the death of the second spouse. This is further evidenced by the fact that the Trust provided no guarantee that the listed beneficiaries in Article Six would receive *any* distribution after the death of the last surviving spouse. In fact, the Schedule specifically acknowledged the possibility that the property in the Schedule would not be owned by the Trust upon the death of the second spouse. See Schedule, Article Six, Section 1 (directing the distribution of the hunting property "provided such property is then owned by [the] Trust."). Accordingly, the probate court correctly limited its interpretation of the language of the Trust to the four corners of the document, and correctly ruled that Article Six did not contain a distribution that would keep that property from entering the Marital Trust and that Virginia has the power to invade the principle of the Trust and alienate the property in Article Six under her general power of appointment.

Affirmed. Respondent, having prevailed in full on appeal, may tax costs. MCR 7.219(A).


/s/ Henry William Saad
/s/ Patrick M. Meter
/s/ Christopher M. Murray